**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **YAHCOB SWINTON,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 18-5067** |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTH.**, *et al.*, | : | |
| *Defendants.* | : | |

<u>**MEMORANDUM**</u>

**I.   Introduction**

At issue in this current matter is whether Defendant Transportation Workers Union, Local 234 (the "Union") breached its duty of fair representation to Plaintiff, Yahcob Swinton, in the handling of his grievance against Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") that he was improperly terminated as a SEPTA bus driver because SEPTA failed to accommodate his disability, a broken ankle.  *See* Compl., Count V, ECF No. 1.

In January 2020, this Court conducted a three-day jury trial and two-day bench trial, during which it heard testimony from Plaintiff and Defendants and reviewed the parties' documentary evidence.  On January 9, 2020, a jury found that SEPTA did not discriminate against Plaintiff by denying his request for an extension of his sick leave past April 24, 2017, or an assignment to an alternative position.  Instead, the jury found that SEPTA had provided Plaintiff with a

reasonable accommodation.  Trial Tr., Jan. 23, 2020, at 109:21-22.  Plaintiff's

claim against the Union for breach of its duty of fair representation was not

decided by the jury, as dictated by Pennsylvania law, and thus, it was the subject of

the subsequent two-day bench trial held before this Court.

Having presided over the three-day jury trial, conducted the two-day bench

trial, reviewed the parties' proposed findings of fact and conclusions of law, and

examined the relevant law, this Court finds as follows:

## II.    Findings of Fact

1.      Plaintiff was hired by SEPTA as a bus operator in 2011.  Trial Tr.,

Jan. 7, 2020, p. 8:4-5 (Swinton Testimony).

2.      As a result of being hired as a bus driver, Plaintiff became a member

of the Union.

## The Collective Bargaining Agreement

3.      The Collective Bargaining Agreement (the "CBA") between SEPTA

and the Union, which was in effect for the duration of this action, governs, among

other things, the rights of Union members relating to their working conditions and

terms of employment.  Ex. D-1.

4.      Section 504 of the CBA concerns the medical disqualification of

Union members and their eligibility for assignment to an Alternative Duty

Position.  Ex. D-3; Trial Tr., Jan. 22, 2020, at 222:17-25.

5.      Alternative Duty Position is defined as a "reserved, light duty position for Medically Disqualified employees."  Ex. D-3, at 1.  "An Alternate Duty Position can be any position for which the employee is qualified and medically capable of performing, including a different permanently budgeted position in the bargaining unit.  In addition, the parties agree that the following full-time classifications shall be Alternate Duty Positions: Vehicle Readiness Coordinator (VRC), Loader, Scrapper and Cashier.  *Id*.

6.      Medically Disqualified is defined in the CBA as follows:

> Based on the employee's medical condition and prognosis, the employee cannot return to his or her former permanently budgeted position with the Authority, as determined by the Authority's Medical Director or his/her designee.  Employees eligible for this classification will be those with IOD injuries regardless of seniority and sick employees with five (5) or more years of seniority at the time of disqualification.

Ex. D-3, at 1.

7.      Indeed, Plaintiff acknowledged that SEPTA's Medical Director, Dr. Erinoff at the relevant time, was the sole decision maker for whether SEPTA employees were deemed "Medically Disqualified."  Trial Tr., Jan. 23, 2020, at 144:17-20 ("Q:  Was it correct that you agree that at SEPTA the sole decision-maker for whether or not an employee should be disqualified is made by Dr. Erinoff?  A:  Correct.").

8.      Similarly, the Medical Director also has the authority to determine whether a SEPTA employee is Temporarily Disqualified, which is defined by the CBA as "[b]ased on the employee's medical condition and prognosis, the employee cannot return to his or her former permanently budgeted position within the Authority for a temporary period of time."  Ex. D-3, at 2.

9.      If a SEPTA employee reaches maximum medical improvement—that is, the employee's injury is no longer continuing to improve with treatment—and remains unable to perform the essential functions of his or her former position, the employee may be deemed Medically Disqualified and become eligible to fill an Alternate Duty Position.  Ex. D-3, at 2.  Thus, in order to be eligible for an Alternate Duty Position, an employee must be deemed Medically Disqualified. Trial Tr., Jan. 22, 2020, at 94:1-4.

10.     Medically Disqualified employees are "placed on the MD List while awaiting assignment to an Alternate Duty Position."  Ex. D-3, at 2; Trial Tr., Jan. 22, 2020, at 95:22–96:1.

11.     Temporarily Disqualified employees "will utilize sick leave or IOD Leave, if otherwise eligible, but will not be placed on the MD List."  Ex. D-3, at 2; Trial Tr., Jan. 22, 2020, at 223:7-10.

12.     The grievance process for contract disputes between SEPTA and the Union involves two steps: (1) an informal contract grievance hearing, and (2) a

Labor Relations Step hearing where a final decision is rendered.  Ex. D-2; Trial Tr., Jan. 22, 2020, at 193:2-10.

13.     The Union has the burden of proof when bringing a contract grievance.  Trial Tr., Jan. 22, 2020, at 190:23–25 & 264:24–265:4.  Moreover, the Union has the initial burden of setting forth in writing the "relevant facts and the sections of the contract which are alleged to be violated and why.  The grievance will also state the remedy requested."  Ex. D-2, at 2.

14.     As a matter of practice, the Union does not typically call SEPTA managers to testify at contract grievance hearings "because they are representing [SEPTA] and their position is their position."  Trial Tr., Jan. 22, 2020, at 192:1-8.

15.     At a Labor Relations Step hearing, "the Union will present specific facts, information, documentation, testimony and witnesses in support of its position."  Ex. D-2, at 2.

16.     If a contract grievance is denied after the informal grievance hearing and a Labor Relations Step hearing, as it was in the case at hand, the Union can decide to take the grievance to binding arbitration.  Ex. D-2, at 2.

17.     The Union's staff meets weekly to review SEPTA's decisions following the Labor Relations Step hearing to determine whether the Union should take a particular grievance to binding arbitration.  Trial Tr., Jan. 22, 2020, at 193:11-21.

18.     The entire staff of the Union, approximately 19 people, then meet to discuss each grievance, and to ultimately vote on whether a particular grievance should be taken to binding arbitration.  Trial Tr., Jan. 23, 2020, at 208:25–209:1 & 214:17–215:5.  Specifically, the Labor Relations Step hearing decision is read to everyone at the staff meeting, each grievance is then discussed, the staff members may ask questions and review the relevant documents, and then the staff votes on how the grievance should be handled.  Trial Tr., Jan. 23, 2020, at 170:17-23 & 215:6-8; Vera. Dep., at 15:8-13; Trial Tr., Jan. 22, 2020, at 194:11-21 & 194:22-195:3.

19.     In deciding whether to take a particular grievance to binding arbitration, the most important factors the Union considers is whether the individual grievance has merit and whether the Union will be successful in arbitration.  Trial Tr., Jan. 22, 2020, at 195:9-16 ("Do[es] [the Union] consider whether the case is likely to be won at arbitration?  A:  Yes.  Q:  Why is that important?  A:  Because we just don't want to throw away the members' money. We have to make sure that we have a good enough argument that we have the possibility of winning."); Trial Tr., Jan. 23, 2020, at 210:4-11.

20.     Arbitration awards are considered precedential as between SEPTA and the Union and thus, the results of an arbitration award affect the outcome of future disputes between SEPTA and the Union.  Trial Tr., Jan. 23, 2020, at 213:21-

25.  Accordingly, the Union considers whether arbitrating a particular case may be more harmful to the membership than not arbitrating it, as "bad cases make bad decisions."  Trial Tr., Jan. 23, 2020, at 215:11-17.

21.     The Union President can overrule the staff's vote on whether to arbitrate a particular contract grievance.  Trial Tr., Jan. 22, 2020, at 195:21-24.

22.     If a Union member disagrees with the Union's decision not to arbitrate a contract grievance, the member has the right to appeal that decision to the Union's Review Committee, which has the power to overrule the staff's decision not to arbitrate a grievance.  Trial Tr., Jan. 22, 2020, at 195:25–196:2, 196:16-21 & 266:21-24; Trial Tr. Jan. 23, 2020, at 171:16-19, 215:23–216:8, 237:2-5 & 266:21-24.

23.     Prior to hearing an appeal, the Review Committee is given all the relevant information about the grievance, including the Labor Step decision and the grievance.  Trial Tr., Jan. 22, 2020, at 196:22–197:1; Trial Tr. Jan. 23, 2020, at 171:20–172:3 & 216:17-25.

24.     "The purpose of the Review Committee is to ascertain new information that has not been heard or received in order to overturn a decision that was made by the staff."  Trial Tr., Jan. 22, 2020, at 266:6-9; *see also* Trial Tr., Jan. 23, 2020, at 171:7-15.

25.     The Union member may present any evidence to the Review

Committee that the member deems relevant to support his or her appeal.  Trial Tr.,

Jan. 22, 2020, at 266:17-20; Trial Tr. Jan. 23, 2020, at 217:1-6.

26.     The Review Committee can, and has, overruled staff decisions not to

arbitrate a particular case.  Trial Tr., Jan. 22, 2020, at 196:16-21; Trial Tr., Jan. 23,

2020, at 216:9-13.

27.     Section 1201 of the CBA provides, in relevant part:

> Section 1201. Dispute Resolution
>
> Disputes between employees' physicians and the Authority's Medical Department of a nature referred to in the following subparagraph shall be resolved by third party, disinterested physicians jointly selected in each dispute by the Authority and the Union. . . .
>
> This procedure refers to the following types of disputes; . . .
>
> (a) Whenever the Authority's Medical Department determines that an employee . . . is able to work and the employee's physician considers the employee unable to work, the third party physician shall determine if such employee is safely and healthfully able to perform his/her job.
>
> ...
>
> (b) Whenever the Authority's Medical Department determines that an employee . . . is unable to work and the employee's physician considers the employee able to work, the third party physician shall determine if such employee is safely able to work.

Ex. D-4.

8

28.     Thus, the CBA makes clear that § 1201 is not intended to challenge a determination made by SEPTA's Medical Director regarding an employee's request to be deemed Medically Disqualified under § 504 of the CBA.  Trial Tr., Jan. 22, 2020, at 128:2-17.

**Plaintiff's Termination**

29.     In May 2016, Plaintiff, who was working as a bus driver out of SEPTA's Midvale location, went out on sick leave due to a non work-related injury.  Ex D-11.

30.     On October 23, 2016, while still out on sick leave, Plaintiff fractured his right ankle, which required surgery and the placement of a metal plate to support his ankle and continued mobility.  Ex. D-13.

31.     During an appointment on October 25, 2016, Plaintiff's orthopedic physician, Dr. Jack Kazanjian D.O., advised Plaintiff that it would take from three to six months for him to be able to return to work.  Ex. D-13.

32.     Plaintiff's condition improved over time; indeed, Plaintiff testified to as much.  Trial Tr., Jan. 23, 2020, at 104:14-16 ("As I stated already, sir, from the moment this injury happened up until now, even now I'm still getting better every day. . . ."); *see also* Exs. D-25 & D-36.

33.     Following Plaintiff's appointment on December 22, 2016, Dr. Kazanjian reported that Plaintiff was "totally, but temporarily disabled. Anticipated date of full recovery: 4/25/2017 (estimated)."  Ex. D-14.

34.     On January 10, 2017, Dr. Kazanjian reported that Plaintiff could not stand, walk, or drive and that he was "unable to work until cleared by me.  At least to 4/25/17."  Ex. D-15; Trial Tr., Jan. 22, 2020, at 132:11-18.

35.     Following Plaintiff's appointment on January 24, 2017, Dr. Kazanjian reported that Plaintiff "has made great strides.  He will progress to regular shoe wear.  I have told him to continue doing his home exercise program."  Ex. D-16.

36.     On February 16, 2017, SEPTA notified Plaintiff that his contractual entitlement to sick leave was set to expire on March 19, 2017, at which time he would be dropped from the rolls and placed on the Priority Recall List with the right to return to his job as a bus driver during the recall period.  Ex. D-17.  SEPTA further advised Plaintiff that he may qualify for an ADA Reasonable Accommodation and that such requests must be made prior to the exhaustion of his sick leave.  Ex. D-17.

37.     On March 1, 2017, at the request of SEPTA's Medical Director, Dr. Erinoff, Dr. Kazanjian completed a "Physical Capacities Form."  Ex. D-19.  Dr. Kazanjian noted that Plaintiff was "[n]ot released to full duty until re-evaluated by me on 3/7/17."  Ex. D-19.  Dr. Kazanjian also reported that the Plaintiff could walk

or stand for six hours a day and drive for up to two hours a day.  *Id.*; Trial Tr., Jan.

23, 2020, at 103:16-19 & 104:4-6.  Dr. Kazanjian further reported that the

Plaintiff's limitations were "Temporary" with an "Estimate release date

4/25/2017."  Ex. D-19, at 3.

38.   Following Plaintiff's appointment on March 7, 2017, Dr. Kazanjian

reported the following:

> Yahcob, last here 01/24/2017, really doing well in regards to
> his wound.  He is getting stronger. . . .  His strength is not back,
> but he feels that he is rehabbing himself properly, but he is not
> completely back to where he needs to be overall. . . .
>
> . . . He lacks about 5 degrees of dorsiflexion.
>
> PLAN:  He is doing very well. He will continue to progress in
> his exercise program.  He can work light duty until further
> evaluation by myself, which will be in 2 months.  At that point,
> hopefully, we can get him back to full duties.

Ex. D-20.

39.   Dr. Erinoff testified that he understood Dr. Kazanjian's March 7,

2017, report to mean that Plaintiff "was continuing to make progress and had not

yet reached maximum medical improvement."  Trial Tr., Jan. 22, 2020, at 136:1-5.

40.   On March 14, 2017, Plaintiff completed SEPTA's "Request for

Reasonable Accommodation for Employees."  Ex. D-21.  Specifically, Plaintiff

requested an additional 60 days of sick leave or another position and stated that

"[a]nother 60 days would allow [him] to recover more & become more mobile."

Ex. D-21.  In that request, Plaintiff admitted that he did not know if his impairment was temporary or permanent and stated that he had not been determined to be Medically Disqualified.  Ex. D-21; Trial Tr., Jan. 23, 2020, at 102:3–103:5.

41.     Plaintiff attached Dr. Kazanjian's answers to SEPTA's Medical Questionnaire dated March 1, 2017, to his request for an accommodation.  Ex. D-21.  As previously stated, this Questionnaire reported that Plaintiff's limitations were "Temporary" with an "Estimate release date 4/25/2017."  Ex. D-21.

42.     On March 27, 2017, Jacqueline Hopkins, Esq., SEPTA's Equal Employment Opportunity & Labor Relations Department Administrator, granted Plaintiff's request for a reasonable accommodation in the form of an extension of his sick leave to April 24, 2017, "**with an expected date of return of April 25.**" Ex. D-22 (emphasis in the original).

43.     After Plaintiff's appointment on April 11, 2017, Dr. Kazanjian reported that Plaintiff "states that he is improved" in addition to the following:

> Exam today shows healing of the ankle incisions.  He has no ankle effusion.  He still lacks about 5 degrees of dorsiflexion. He has full plantarflexion, Lateral incision is well-healed.  I do not see any evidence of flatfoot deformity or ankle joint swelling.
>
> * * *
>
> PLAN:  He is not back to his previous level.  I have told him to continue working on his exercise program.  He will see me back in May to discuss his progress at that standpoint.

Ex. D-25.

44.     Dr. Kazanjian also completed a "Primary Treating Physician's Progress Report" on April 11, 2017, for Plaintiff.  Ex. D-23.  This Progress Report stated that "[t]he patient is capable of performing his/her job with the following restrictions: Unsafe to drive bus."  Ex. D-23.   However, Dr. Kazanjian did not indicate that Plaintiff was "totally and permanently disabled."  Exs. D-23, D-24 & D-25; Trial Tr., Jan. 22, 2020, at 136:6-17.

45.     On April 18, 2017, Plaintiff delivered Dr. Kazanjian's April 11, 2017, report to Latoya Reid, the medical librarian at SEPTA's Medical Department. Trial Tr., Jan. 7, 2020, at 104:18-20 & 105:1-3 (Swinton Testimony); Trial Tr., Jan. 22, 2020, at 67:9-12; Ex. P-7.

46.     Reid testified that she did not read the documents that Plaintiff gave to her, nor did she see a handwritten note from Plaintiff included in the documents. Trial Tr., Jan. 22, 2020, at 43:12-17.  Reid further testified that she did not destroy Plaintiff's medical records.  Trial Tr., Jan. 22, 2020, at 42:23-25.

47.     On April 18, 2017, Dr. Erinoff reviewed Dr. Kazanjian's April 11, 2017, Progress Report.  Trial Tr., Jan. 22, 2020, at 134:17-19.

48.     After reviewing Dr. Kazanjian's Progress Report and Plaintiff's medical records, Dr. Erinoff determined that Plaintiff "was not qualified for disqualification."  Trial Tr., Jan. 22, 2020, at 109:16-18 & 100:4-10.

13

49.     In a letter dated April 21, 2017, Dr. Erinoff informed Plaintiff that he had "reviewed" the "medical information" submitted on April 18, 2017, and requested that Plaintiff provide updated medical information regarding his condition by May 19, 2017.  Ex. D-26.

50.     On April 25, 2017, SEPTA dropped Plaintiff from its employment rolls as a result of his having exhausted his contractual entitlement to sick leave along with the additional sick leave granted by SEPTA in response to Plaintiff's request for a reasonable accommodation.  Ex. D-27; Trial Tr., Jan. 7, 2020, at 30:17-22 (Melhuish Testimony).

51.     On April 26, 2017, SEPTA placed Plaintiff on the Priority Recall List[1] in accordance with the CBA.  Trial Tr., Jan. 22, 2020, at 72:10-13 & 74:1-4; Trial Tr., Jan. 23, 2020, at 123:3-8; Ex. D-48, at 2.

52.     On April 28, 2017, Union Business Agent Ronald Newman filed a grievance on Plaintiff's behalf in order to verify the exhaustion of Plaintiff's contractual sick leave and to protect his Priority Recall rights.  Ex. D-28; Trial Tr., Jan. 22, 2020, at 163:13-21 & 199:19-21.  Specifically, the "Union protests the Authority dropping Operator Yahcob Swinton, #16214 for Expiration of Sick Leave."  Ex. D-28.

---

[1] "While on the Priority Recall List, an employee may be recalled to his/her former permanently budgeted position, if medically capable of performing the job, or assigned to an Alternate Duty Position, if eligible under the terms of this Article." Ex. D-3.

53.     On May 7, 2018, the Union withdrew this grievance after Plaintiff had exhausted his allotted time on the Priority Recall List.  *See* Trial Tr., Jan. 22, 2020, at 200:7-15; *see also* Ex. D-3; Ex. D-48, at 2.

54.     On May 2, 2017, Plaintiff contacted Union Business Agent Gary Stepps to inquire as how to be determined Medically Disqualified.  Trial Tr., Jan. 7, 2020, at 8:7-17 (Stepps Testimony); Trial Tr., Jan. 23, 2020, at 197:7-15. Stepps testified that Plaintiff did not ask him to file a grievance at that time.  Trial Tr., Jan. 23, 2020, at 197:16-18.  Stepps further testified that he advised Plaintiff on the process to be deemed Medically Disqualified.  Trial Tr., Jan. 7, 2020, at 8:14-17 (Stepps Testimony).

55.     On May 4, 2017, Plaintiff obtained an updated Physical Capacities Form signed by Dr. Kazanjian.  Ex. D-29.  The May 4, 2017 Physical Capacities Form reported that Plaintiff could stand or walk for eight hours at a time but was "unsafe to drive bus."  Ex. D-29.  The Physical Capacities Form did not state that Swinton was permanently disabled.  Ex. D-29.  Indeed, the Form reported improvements in Plaintiff's ability to stand and walk.  Trial Tr., Jan. 22, 2020, at 137:5-18.

56.     On May 5, 2017, Plaintiff attempted to submit an updated Physical Capacities Form signed by Dr. Kazanjian to SEPTA Medical.  *See* Ex. D-24. However, SEPTA Medical returned the form to Plaintiff and advised Plaintiff that

he was no longer on SEPTA's rolls.  Trial Tr., Jan. 7, 2020, at 52:9-17 (Swinton Testimony).

57.     Plaintiff testified that prior to May 5, 2017, he did not know that SEPTA had dropped him from the rolls.  Trial Tr., Jan. 7, 2020, at 113:15-21 (Swinton Testimony).

58.     On May 8, 2017, Plaintiff called Stepps to inquire about the independent medical evaluation under Section 1201 of the CBA.  Trial Tr., Jan. 7, 2020, at 9:18-20 (Swinton Testimony).  Stepps testified that he advised Plaintiff that Section 1201 did not apply to his particular matter because no dispute existed between SEPTA's Medical Department and Plaintiff's physician.  Trial Tr., Jan. 7, 2020, at 9:21-24; *see also* Ex. D-4.

59.     On November 28, 2017, Plaintiff was examined by Dr. Kazanjian for the first time since April 11, 2017.  Ex. D-36; Trial Tr., Jan. 23, 2020, at 105:21-23 & 106:5-7.  During that appointment, Plaintiff informed Dr. Kazanjian that "he has improved, but he does not feel like he can go back to work driving a bus, but he can go back to work operating a car."  Ex. D-36; Trial Tr., Jan. 23, 2020, at 106:21–107:13.  Dr. Kazanjian reported that Plaintiff "lacks only 2 degrees of ankle dorsiflexion with full plantar flexion."  Ex. D-36; Trial Tr., Jan. 23, 2020, at 107:14-19.

60.     Between April 28, 2017, and November 1, 2017, Plaintiff did not call or otherwise contact Newman.  Trial Tr., Jan. 22, 2020, at 161:4-7 & 200:21–201:08.

61.     Between June 2017 and November 1, 2017, Plaintiff did not call anyone on the Union staff.  Trial Tr. Jan. 23, 2020, at 112:13–113:1 & 198:8-16.

62.     Mr. Swinton did not visit the Union Hall until November 13, 2017. Ex. D-56; Trial Tr., Jan. 7, 2020, at 154:25–155:6 (Swinton Testimony).

**The Union Files a Grievance on Plaintiff's Behalf**

63.     Plaintiff first contacted the Union about filing a Medical Disqualification grievance on or around November 1, 2017.  Trial Tr., Jan. 23, 2020, at 52:12-16.  Stepps returned Swinton's telephone call the next day and spoke to Plaintiff for approximately twelve minutes.  Trial Tr., Jan. 23, 2020, at 52:24–53:7 & 115:4-9.

64.     Plaintiff also contacted Newman about filing a contract grievance over SEPTA's failure to deem him Medically Disqualified in November 2017. Trial Tr., Jan. 22, 2020, at 200:16-20.  On November 6, 2017, Plaintiff spoke to Newman for twenty minutes.  Trial Tr., Jan. 23, 2020, at 53:19–54:2 & 116:2-7.

65.     On November 13, 2017, the Union's President, Willie Brown, and Newman met with Plaintiff to discuss a grievance over SEPTA's failure to deem

him Medically Disqualified.  Trial Tr., Jan. 22, 2020, at 201:9-23; Trial Tr. Jan. 23, 2020, at 117:5-17 & 220:19-25.

66.     Brown asked Newman to attend the November 13, 2017, meeting with Plaintiff because it was his standard practice to have the business agent who represents the member's location attend such meetings.  Trial Tr., Jan. 23, 2020, at 221:5-13.

67.     At the meeting, Plaintiff explained that he had turned in his paperwork, but that SEPTA would not disqualify him.  Trial Tr., Jan. 23, 2020, at 221:17–222:2.  Brown and Newman advised Plaintiff to go to SEPTA Medical and pick up the medical records that he claimed to have submitted prior to being dropped from the rolls.  Trial Tr., Jan. 22, 2020, at 205:17–206:8; Trial Tr. Jan. 23, 2020, at 117:18-24 & 222:24–223:11.  Brown testified that he emphasized to Plaintiff that the Union needed medical documentation supporting Plaintiff's case to have any chance of prevailing in the grievance procedure or in arbitration.  Trial Tr., Jan. 23, 2020, at 222:5-23.

68.     On November 15, 2017, Plaintiff went to SEPTA's Medical Department to obtain his file.  Trial Tr., Jan. 23, 2020, at 55:18–56:5.  After examining the file, Plaintiff noticed that his letter requesting disqualification was not in SEPTA's file.  Trial Tr., Jan. 23, 2020, at 56:8-21.  Plaintiff did not have

reason to believe that any documents in his medical file were missing until then. Trial Tr., Jan. 23, 2020, at 117:25–118:6 & 118:16-18.

69.     On November 15, 2017, Brown and Newman received a letter from Plaintiff stating, "[i]t's come to my attention that documents were removed from my file at SEPTA Medical.  The initial documents that I turned in dated 4-17-17 for the disqualification process have been removed."  Ex. P-35; Trial Tr., Jan. 22, 2020, at 183:18-20.

70.     Later that same day, in response to Plaintiff's letter, Newman wrote to SEPTA and requested information concerning Plaintiff's request for a reasonable accommodation.  Ex. D-33; Trial Tr., Jan. 22, 2020, at 207:19–208:6; Trial Tr. Jan. 23, 2020, at 225:6-8.

71.     Two days later, SEPTA refused the Union's request for Plaintiff's medical information based on privacy concerns.  Ex. D-33; Trial Tr., Jan. 22, 2020, at 208:7-10.

72.     On November 17, 2017, Plaintiff emailed Newman a screenshot from SEPTA's Medical Department suggesting that he had applied for Medical Disqualification on April 18, 2017.  Ex. P-5; Trial Tr., Jan. 22, 2020, at 175:7-16 & 208:11–209:1; Trial Tr., Jan. 23, 2020, at 120:1-9.

73.     That same day, based on Plaintiff's representations and the receipt of the screenshot, Newman filed a grievance on Plaintiff's behalf stating that SEPTA

19

should have accepted the medical documentation Plaintiff provided as sufficient to medically disqualify him as a bus operator, thereby making him eligible to fill an Alternate Duty Position.  Ex. P-4; Trial Tr., Jan. 22, 2017, at 175:17–176:2 & 209:5-7; Trial Tr., Jan. 23, 2020, at 120:14-21.  Brown authorized the filing of that grievance.  Trial Tr., Jan. 23, 2020, at 225:21-22.

74.     The grievance stated, "[t]he Union protests the Authority violating Operator Yahcob Swinton's . . . right to fill an Alternate Duty Position by refusing to honor the disqualification papers he submitted to SEPTA Medical on April 4, 2017."  Ex. D-34; Trial Tr., Jan. 23, 2020, at 122:18-22.

75.     In a later telephone conversation with Plaintiff, Brown asked Plaintiff to obtain medical documentation from his treating physician indicating that he was Medically Disqualified.  Trial Tr., Jan. 23, 2020, at 230:22–231-3.  Brown testified, "that's when I think [Swinton] told me his doctor and SEPTA's doctor were in cahoots, he couldn't get certain information.  I said, well, if you can't get exactly what you gave SEPTA, just get something from your doctor saying he feels you are disqualified, then we can take this further.  That is the crux of the case." Trial Tr., Jan. 23, 2020, at 230:22–231-3.

76.     Brown assigned Newman to represent Plaintiff because Newman was the designated business agent for bus operators at the Midvale location, he was familiar with the process, and he was the most qualified person to handle this

grievance.  Trial Tr., Jan. 22, 2020, at 187:16-24; Trial Tr., Jan. 23, 2020, at 226:9-17.

77.     Mr. Newman has handled thousands of grievances on behalf of Union members over the course of more than fifteen years.  Trial Tr., Jan. 22, 2020, at 187:6–188:23.  Moreover, he has also represented Union members at both informal grievance hearings and Labor Relations Step hearings.  Trial Tr., Jan. 22, 2020, at 97:14-15 & 188:16-23.

**The Contract Grievance Hearing**

78.     On December 12, 2017, SEPTA and the Union held a "Contract Grievance— Informal Hearing" in accordance with Section 201.A of the CBA. Ex. D-37.  SEPTA's Senior Director for Surface Transportation, David Rogers, presided over the informal hearing.  Ex. D-37.

79.     Newman met with Plaintiff to prepare for the hearing at the Union's Midvale office for about 30 to 45 minutes before the hearing.  Trial Tr., Jan. 22, 2020, at 210:14-24.  Newman prepared for Plaintiff's hearing the same way he prepared for other grievance hearings.  Trial Tr., Jan. 22, 2020, at 210:25–211:2.

80.     During the hearing, Newman argued that Plaintiff had submitted his Medical Disqualification paperwork on April 18, 2017.  Ex. D-37; Trial Tr., Jan. 22, 2020, at 211:15-23; Trial Tr., Jan. 23, 2020, at 131:17-23.  Newman introduced the screenshot as evidence that Plaintiff had applied for Medical Disqualification.

21

Ex. D-37; Trial Tr., Jan. 22, 2020, at 211:24–212:1; Trial Tr., Jan. 23, 2020, at

132:20–133:2.  Moreover, Newman argued that Plaintiff should be reinstated to a

light duty position.  Ex. D-37; Trial Tr., Jan. 22, 2020, at 212:3-5; Trial Tr., Jan.

23, 2020, at 132:3-7.

81.    Plaintiff attended the informal hearing and spoke on his own behalf.

Trial Tr., Jan. 23, 2020, at 126:15-17 & 212:6-14.

82.    The Union did not call Dr. Erinoff or Reid to testify at the informal

hearing.  Trial Tr., Jan. 22, 2020, at 177:15-17 & 212:15-19.  Newman testified

that he decided not to call either Dr. Erinoff or Reid to testify because he thought

that their testimony would support SEPTA's position.  Trial Tr., Jan. 22, 2020, at

212:22–213:8.

83.    On December 12, 2017, Rogers issued the resolution of the grievance

hearing denying Plaintiff's grievance.  Ex. D-37.  Specifically, Rogers stated,

"[t]here is no evidence that Operator Swinton submitted the documentation

required for medical disqualification before being dropped from the rolls of the

Authority on April 25, 2017.  Grievance Denied."  Ex. D-37.

84.    Newman advised Plaintiff of Rogers's denial of the grievance.  Trial

Tr., Jan. 22, 2020, at 213:21-25; Trial Tr., Jan. 23, 2020, at 133:21-24.

85.    After the grievance was denied at the informal hearing, the Union

continued to pursue the matter at the Labor Relations Step hearing.  Trial Tr., Jan.

23, 2020, at 227:2-6.

86.     In preparation, Plaintiff emailed Newman a copy of a Primary

Treating Physician's Progress Report dated April 11, 2017.  Ex. D-38; Trial Tr.,

Jan. 22, 2020, at 214:10-15.  Exhibit D-23 is clearer copy of the Progress Report

that Plaintiff emailed on December 20, 2017.  Trial Tr., Jan. 22, 2020, at 215:22–

216:14.

87.     Plaintiff told Newman that the document marked as Exhibit D-23 was

the same document as the document marked Exhibit D-24, which was the

document Plaintiff had turned into SEPTA's Medical Department on May 5, 2017,

and on April 18, 2017.  Trial Tr., Jan. 22, 2020, at 217:24–218:7, 232:24–233:7 &

234:1-6; Trial Tr., Jan. 23, 2020, at 16:17-20.

88.     Newman noticed this peculiarity and was concerned that Exhibit D-23

was not exactly the same as Exhibit D-24.  Trial Tr., Jan. 22, 2020, at 218:10–

219:4, 234:7-13 & 247:5-12.

89.     Indeed, while the bottom portion of Exhibit D-23 is identical to the

bottom portion of Exhibit D-24, the upper portions of the two documents differ.

Exs. D-23 & D-24; Trial Tr., Jan. 22, 2020, at 236:11-20 & 245:25–247:4.

90.     Plaintiff testified that the handwriting on top of Exhibit D-24 was his

handwriting.  Trial Tr., Jan. 23, 2020, at 22:4-8.

91.     Plaintiff also testified incredibly that Dr. Kazanjian filled out Exhibits

D-23 and D-24 separately, but that his doctor "was able to write word for word, letter for letter, as if he copied that."  Trial Tr., Jan. 23, 2020, at 22:21–23:7. Plaintiff's counsel also represented to the Court that the bottom half of the two documents were "exactly the same because the same person wrote them."  Trial Tr., Jan. 23, 2020, at 23:13-14.

92.    Newman was concerned that showing Exhibit D-23 to SEPTA might lead to SEPTA charging Plaintiff with "falsification," a dischargeable offense. After raising the issue and sharing his concerns with Plaintiff, Plaintiff told Newman not to submit Exhibit D-23 or D-24 to SEPTA.  Trial Tr., Jan. 22, 2020, at 218:12-15, 219:11-25 & 234:7-15.

93.    Importantly, neither Exhibit D-23 nor D-24 provided support for Plaintiff's contention that he was Medically Disqualified at the time he was dropped from SEPTA's rolls.  Indeed, in both Exhibits the box for "totally and permanently disabled" was left unchecked by Dr. Kazanjian.  Exs. D-23 & D-24.

94.    On December 21, 2017, Plaintiff called and spoke with Brian Pollitt, the Executive Vice-President of the Union.  Trial Tr., Jan. 23, 2020, at 48:15–49:24.  He asked Pollitt to represent him at the Labor Relations Step hearing.  Trial Tr., Jan. 23, 2020, at 50:10-14.[2]

95.    The following day, Plaintiff complained to Brown about Newman for

---

[2] Plaintiff also asked that President Brown personally represent him at the labor step hearing.  Trial Tr., Jan. 23, 2020, at 137:6-10.

the first time.  Ex. P-9.  Specifically, Plaintiff complained about Newman

questioning the authenticity of Exhibit D-23.  Ex. P-9; Trial Tr., Jan. 23, 2020, at

47:5-18.  Plaintiff also complained that Newman had only called him "the day

before the [informal grievance] hearing after 5pm to let me know that I had a

hearing at 9 am the next day."  Ex. P-9; Trial Tr., Jan. 23, 2020, at 129:24–130:21.

However, Plaintiff testified at trial that Newman had actually called him at

approximately 12:00 p.m. the day before the informal hearing rather than at 5:00

p.m.  Trial Tr., Jan. 23, 2020, at 127:3-23 & 129:9-15; Ex. P-63, at 30.

96.     On December 26, 2017, at 6:07 p.m., Brown returned a call from

Plaintiff and spoke to him for 38 minutes about his complaints regarding

Newman's handling of his grievance.  Trial Tr., Jan. 23, 2020, at 43:1-11, 44:12-15

& 134:24–135:4.

97.     On December 29, 2017, Brown met with Plaintiff in person for a

second time to discuss Plaintiff's case and his complaints about Newman.  Trial

Tr., Jan. 23, 2020, at 136:5-14 & 230:4-22; Ex. D-66.  Brown testified that he

explained to Plaintiff that Newman was the best person to represent Plaintiff at the

Labor Relations Step hearing because of his experience with this type of case and

the fact that Newman had been involved with the grievance from the beginning.

Trial Tr., Jan. 23, 2020, at 231:13-20.

98.     Brown testified that if he had reason to believe that Newman was

prejudiced against Plaintiff or could not have done a good job representing

Plaintiff, he would have appointed someone else to argue Plaintiff's case at the

Labor Relations Step hearing.  Trial Tr., Jan. 23, 2020, at 231:21-24.

**The Labor Relations Step Hearing**

99.    On January 4, 2018, the Union and SEPTA convened a Labor

Relations Step hearing, which Bud Scott Jr., SEPTA Labor Relations Manager,

presided over and Plaintiff and Newman attended.  Ex. D-46.

100.   Plaintiff suffered no prejudice regarding the timing of the hearing, as

the time limits were extended by mutual agreement.  Trial Tr., Jan. 22, 2020, at

93:7-17; Ex. D-46.

101.   Plaintiff rejected Newman's representation and elected to represent

himself at the hearing because he thought that he cold do a better job presenting his

case than Newman could.  Trial Tr., Jan. 22, 2020, at 84:22-23 & 91:12- 15; Trial

Tr., Jan. 23, 2020, at 65:21–66:1 & 136:22–137:23.

102.   In preparation for the hearing, Plaintiff prepared a four-page

typewritten statement.  Ex. P-11; Trial Tr., Jan. 23, 2020, at 64:17-21 & 137:14-17.

103.   Plaintiff did not show his statement to the Union in advance of its

submission to SEPTA or ask for the Union's opinion on its contents.  Trial Tr., Jan.

23, 2020, at 138:25–139:2.  Plaintiff submitted his statement to Scott along with

other documents.  Trial Tr., Jan. 22, 2020, at 57:14-18; Trial Tr., Jan. 23, 2020, at 65:5-9.

104.   Plaintiff's statement accused the Union of conspiring to destroy his medical records.  Ex. P-11, at 3-4; Trial Tr. Jan. 23, 2020, at 141:9-22.  However, Plaintiff admitted at trial that he had no evidence to support his conspiracy theory.  Trial Tr., Jan. 23, 2020, at 141:23-25 & 156:10-15.  In fact, he admitted that he has no knowledge of who, if anyone, removed documents from his medical file.  Trial Tr., Jan. 23, 2020, at 142:5-7; Trial Tr., Jan. 7, 2020, at 105:10-15 (Swinton Testimony).

105.   At the hearing, Plaintiff also presented the screenshot and asserted that it proved he had submitted a request for a medical disqualification to SEPTA's Medical Department.  Trial Tr., Jan. 22, 2020, at 65:18-22 & 66:20-23.  Additionally, Plaintiff presented an X-ray picture of his injury showing the metal plates and the eight screws to the hearing officer.  Trial Tr., Jan. 23, 2020, at 139:6-9.

106.   Ultimately, Plaintiff requested to be deemed Medically Disqualified as a bus driver and given an Alternate Duty Position by SEPTA.  Trial Tr., Jan. 22, 2020, at 83:2-16; Trial Tr., Jan. 23, 2020, at 140:9-11.

107.   During the Labor Relations Step hearing, Plaintiff never requested that an independent medical examination be performed nor did he ask for the

appointment of an independent medical examiner as part of the relief he sought. Trial Tr., Jan. 22, 2020, at 96:11-14; Trial Tr., Jan. 23, 2020, at 142:8-14.

108.   Plaintiff did not call any witnesses at the hearing.  Trial Tr., Jan. 22, 2020, at 92:3-4 & 221:2-8; Trial Tr., Jan. 23, 2020, at 140:16-18.  Plaintiff did not ask that the hearing be continued or postponed so that he could call witnesses, nor did he ask anyone from the Union whether he could request postponement of the hearing.  Trial Tr., Jan. 22, 2020, at 92:8-10; Trial Tr., Jan. 23, 2020, at 140:19-25.

109.   Plaintiff did not present any doctor's notes or reports stating that he was permanently disabled from driving a bus.  Trial Tr., Jan. 22, 2020, at 100:12-16.  Indeed, Plaintiff admitted at trial that he never introduced any document from his physician stating that he was permanently disqualified.  Trial Tr., Jan. 23, 2020, at 140:12-14.

110.   After the hearing, Scott spoke to Dr. Erinoff and Reid as part of conducting his "due diligence" investigation.  Trial Tr., Jan. 22, 2020, at 85:15-21.

111.   Dr. Erinoff told Scott that Plaintiff "was not disqualified because he did not meet the maximum medical improvement."  Trial Tr., Jan. 22, 2020, at 86:22-23.  In response to an email from Scott, Dr. Erinoff wrote, "[s]ince [Swinton] had not reached maximum medical improvement, I was not contemplating a disqualification."  Ex. D- 43.

112.    After the hearing, but prior to reaching his decision, Scott contacted and spoke to Plaintiff directly regarding whether he submitted a letter requesting disqualification.  *See* Ex. D-44; Trial Tr., Jan. 22, 2020, at 98:7-14; Trial Tr., Jan. 23, 2020, at 142:22–143:4.

113.    On January 23, 2018, Scott issued SEPTA's Labor Relations Step hearing decision denying Plaintiff's grievance.  Ex. D-46.[3]

114.    In his opinion, Scott concluded that, "the documentation [Plaintiff] submitted from his treating physician on April 18, 2017, was reviewed by the Medical Director.  The Director determined that the Grievant did not reach maximum medical improvement; therefore, he was not medically disqualified." Ex. D-46, at 2; Ex. D-48, at 2.

115.    Scott further held that Plaintiff "was placed on the priority recall list in accordance with Section 504 III(5) of the Collective Bargaining Agreement. When he is medically able to fully perform his work, he may be recalled to duty." Ex. D-46, at 2; Ex. D-48, at 2.

**The Union Decides Not to Take Plaintiff's Grievance to Arbitration**

_____

[3] On February 1, 2018, Mr. Scott issued a slightly revised opinion addressing when Plaintiff's Priority Recall period would end.  Exs. D-46 & D-48; Trial Tr., Jan. 23, 2020, at 144:24–145:5.

116.   After receiving Scott's decision, the Union considered whether to take Plaintiff's grievance to binding arbitration against SEPTA.  Ex. D-49; Trial Tr., Jan. 22, 2020, at 181:12-21 & 224:5-7.

117.   The Union staff met to discuss Plaintiff's grievance.  Trial Tr., Jan. 22, 2020, at 224:5-13; Trial Tr., Jan. 23, 2020, at 234:24–235:2.  At that meeting, Plaintiff's Labor Relations Step hearing decision was read to the Union staff and discussed.  Trial Tr., Jan. 23, 2020, at 170:17-18; Vera Dep., at 16:1-7.  Newman explained what happened at the hearing so that the staff could understand the issues in dispute in Plaintiff's case.  Vera Dep., at 14:14–15:3, 16:14-16 & 21:21–22:13.

118.   The staff asked questions about Plaintiff's grievance, reviewed the relevant documentation, and spent about 30-45 minutes discussing the grievance prior to deciding whether the case should be brought to arbitration.  Trial Tr., Jan. 22, 2020, at 225:3-11.

119.   The staff ultimately voted not to arbitrate Plaintiff's grievance.  Trial Tr., Jan. 22, 2020, at 225:12-15.  Newman abstained from the vote.  Trial Tr., Jan. 22, 2020, at 225:16-21.

120.   The Union notified Plaintiff by way of letter dated February 8, 2018, that "after careful consideration of the facts surrounding the disciplinary action taken against you by SEPTA, the Union has decided not to take your case to

arbitration.  Based on the facts and the contract, we have concluded that your case lacks merit and we would be unable to secure your reinstatement before a neutral arbitrator."  Ex. D-49.

121.   The letter further advised Plaintiff that if he disagreed with the Union's decision, he had the right to appeal the decision to the Union's Review Committee.  Ex. D-49; Trial Tr., Jan. 23, 2020, at 147:16-18.  However, should he choose to appeal, he "must set forth why you believe the Union should arbitrate your case and include relevant facts, witness statements, documents or authorities that you contend would allow the Union to win your reinstatement in arbitration."  Ex. D-49.

122.   In reaching this decision, the Union concluded that the evidence did not support Plaintiff's contention that he was Medically Disqualified as that term is defined by the CBA and that under the CBA, SEPTA's medical director had the right to determine if Plaintiff was Medically Disqualified.  Trial Tr., Jan. 23, 2020, at 234:1-18 & 235:5-21.

123.   Plaintiff understood that he had the opportunity to present new evidence, including medical documents and witnesses, in his appeal to the Union's Review Committee.  Trial Tr., Jan. 23, 2020, at 148:10-20.

124.   On February 20, 2018, Plaintiff appealed the Union's decision not to arbitrate his case.  Ex. P-13; Trial Tr., Jan. 22, 2020, at 182:1-5; Trial Tr., Jan. 23,

2020, at 148:21–149:2.  In his request to appeal however, Plaintiff advised that "[a]t this time I do not have any new information or witnesses or evidence to present."  Ex. D-50; Trial Tr., Jan. 23, 2020, at 68:3-6 & 149:3-6.

125.    The next day, the Union scheduled an appeal hearing for March 2, 2018, before the Union's Review Committee.  Ex. P-14; Trial Tr., Jan. 23, 2020, at 68:19-24 & 149:7-20.

126.    The Review Committee, consisting of three Union staff representatives and a recording secretary, met on March 2, 2018, to hear Plaintiff's appeal. Ex. P-15.

127.    Plaintiff represented himself before the Review Committee.  Ex. D-52; Trial Tr., Jan. 23, 2020, at 172:23-25; Vera Dep., at 35:12-14.  Plaintiff testified at trial that he "was given the opportunity to plead my case as to why I felt the appeal should be given, why my case should be taken to arbitration."  Trial Tr., Jan. 23, 2020, at 69:22–70:1.

128.    Plaintiff did not provide the Review Committee with any new evidence regarding his eligibility for Medical Disqualification.  Trial Tr., Jan. 22, 2020, at 268:4-10.  Specifically, he failed to provide any documentation supporting his allegation that he was permanently disabled.  Trial Tr., Jan. 22, 2020, at 270:18-21.

129.    Plaintiff never asked the Review Committee to seek an independent

third-party medical examination under Section 1201 of the CBA.  Trial Tr., Jan. 22, 2020, at 273:16-20.

130.    Plaintiff also never asked the Review Committee to arbitrate an alleged ADA claim against SEPTA.  Trial Tr., Jan. 23, 2020, at 177:22-25.

131.    One of the Review Committee members testified that he did not vote in favor of arbitrating the case because he did not "have substantial evidence that would show that [Plaintiff] was going to be permanently disqualified from his position as a bus operator.  That's what I was looking for from after that certain date.  That's why you – you just asked me why I voted, I needed evidence.  I didn't have evidence to show me that he would have been disqualified."  Vera Dep., at 31:4-14.

132.    The Review Committee unanimously concluded that Plaintiff failed to provide adequate documentation to support his claim that he was eligible to be Medically Disqualified under the CBA.  Ex. D-52; Trial Tr., Jan. 22, 2020, at 270:22–272:10; Trial Tr. Jan. 23, 2020, at 191:7-13; Vera Dep., at 33:4-10.

133.    After considering the evidence in Plaintiff's file and his presentation, the Review Committee unanimously decided, "NOT TO OVERTURN THE DECISION NOT TO ARBITRATE."  Ex. D-52; Trial Tr., Jan. 22, 2020, at 272:13-17; Vera Dep., at 30:14–31:3.

134.    On March 6, 2018, Plaintiff was advised in writing that, the "Review

Committee has met and considered your recent appeal from the TWU Staff

decision not to seek arbitration regarding your grievance.  On the basis of this

further review, Local 234 has decided that it will not arbitrate this grievance for the

reasons stated in my previous letter."  Ex. D-53.

## III.    Conclusions of Law

1.      Plaintiff's sole claim against the Union is that the Union breached its

duty of fair representation by deciding not to arbitrate Plaintiff's contract grievance

against SEPTA.  ECF No. 1 at 12.

2.      This Court has supplemental jurisdiction over Count V of Plaintiff's

Complaint, Breach of Duty of Fair Representation, under 28 U.S.C. § 1367, as that

claim is "so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy."  28 U.S.C. § 1367.

3.      Public employee unions certified as an exclusive bargaining

representative, like the Union, "ha[ve] a correlative duty of fair representation."

*Lopez v. Transportation Workers Union Local 234*, No. 16-5515, 2018 WL

1757726, at *4 (E.D. Pa. Apr. 12, 2018) (*quoting Felice v. Sever*, 985 F.2d 1221,

1226 (3d Cir. 1993)).

4.      To prevail on Plaintiff's sole claim against the Union, Plaintiff must

prove that the Union breached its duty of fair representation by acting in an

arbitrary manner, in a discriminatory manner, or in bad faith. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991).

5.    In deciding whether the Union breached its duty to Plaintiff, the Court must apply a "highly deferential" standard in favor of the Union when examining the Union's actions. *Air Line Pilots Ass'n*, 499 U.S. at 78.

6.    This highly deferential standard "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong, and even if its errors in judgment may rise to the level of negligence." *Lopez,* 2018 WL 1757726, at *4.

7.    Accordingly, Plaintiff's claim must fail even if the Court concludes that the Union's judgment not to arbitrate was "ultimately wrong" or even negligent. *Lopez*, 2018 WL 1757726, at *5; *Marquez v. Screen Actors Guild, Inc*., 525 U.S. 33, 45-46 (1998) ("This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong."); *Martino v. Transportation Workers Union Local 234*, 480 A.2d 242, 250 n.12 (Pa. 1984) ("the union is not responsible for negligence in processing a grievance").

8.    This deferential standard results, in part, from the fact that the "courts must give 'due regard for the fact that both the advocates and the tribunal members

are laymen,' not lawyers." *Lopez,* 2018 WL 1757726 at *5 (*quoting Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 961 (3d Cir. 1981)).

9.     "[A] labor union has broad discretion to receive, pass upon, and withdraw grievances." *Gearhart, et al. v. American Federation of State, County & Municipal Employees*, 2004 WL 1293261 at *3 (Pa. Commw. Apr. 7, 2004) (citing *Hughes v. Council 13, AFSCME*, 629 A.2d 194, 195 (Pa. Commw. 1993)); *see also Vaca v. Sipes*, 386 U.S. 171, 191 (1967) (a union has "discretion to supervise the grievance machinery and to invoke arbitration").

10.     "A union has no obligation to arbitrate what it deems to be an unwinnable case, and it may abandon a grievance, so long as it does not act arbitrarily or in bad faith." *Lopez,* 2018 WL 1757726, at *6* (internal citations and quotations omitted).

11.     The Union possesses "discretionary power to settle or even to abandon a grievance, so long as it does not act arbitrarily, and this is true even if it can later be demonstrated that the employee's claim was meritorious." *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir. 1970) (citations omitted).

12.     Thus, "[a] union's decision not to pursue arbitration is sound, where it does not take a case to arbitration because . . . it is satisfied that the grievance lacks merit." *Gearhart*, 2004 WL 1293261, at *3 (citations omitted).

13.    To prove the Union acted arbitrarily, Plaintiff must show that the Union's conduct was "so far outside a wide range of reasonableness as to be irrational." *Bakos v. Am. Airlines, Inc.*, 748 F. App'x 468, 471-72 (3d Cir. 2018) (citation and quotation omitted).

14.    Moreover, in determining whether the Union acted "so far outside a wide range of reasonableness as to be irrational," the Court must consider the Union's behavior "in the light of the factual and legal landscape at the time of the union's actions." *Id*.

15.    To prove discrimination, Plaintiff must have produced "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Bakos*, 748 F. App'x at 472.

16.    To prove bad faith, Plaintiff had to "show that the union had hostility toward plaintiff or the plaintiff's class and that the hostility negatively affected the union's representation of the plaintiff." *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 371-72 (E.D. Pa. 2015) (citations and quotations omitted).

17.    Further, in order to find that the Union acted in bad faith, "[t]here must be substantial evidence of fraud, deceitful action or dishonest conduct." *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299 (1971) (citation and quotation omitted).

18.     Plaintiff's sole and exclusive remedy should the Court find that the Union breached its duty of fair representation is an order compelling the Union to arbitrate his grievance with SEPTA as a party in the case.  43 P.S. §1101.903; *Martino v. Transportation Workers Union Local 234*, 480 A.2d 242, 252 (Pa. 1984).

19.     The Court finds by preponderance of the evidence that the Union did not breach its duty of fair representation because it did not act arbitrarily, discriminatorily, or in bad faith in handling Plaintiff's grievance.

20.     Indeed, the Union did not act "so far outside a wide range of reasonableness as to be irrational" in its handling of Plaintiff's grievance.  In fact, the record shows that the Union handled Plaintiff's grievance in the same manner that it typically handled other members' grievances and in accordance with its standard procedures and practices.  Plaintiff was given every opportunity to present his grievance to SEPTA at the contract grievance hearing and at the Labor Relations Step hearing, and he had the opportunity to do so with the Union's expertise and representation at his disposal.  Moreover, even after Plaintiff's grievance was denied by SEPTA at both the informal hearing and the Labor Relations Step hearing, he also had the opportunity to request that the Union take his case to binding arbitration and then to appeal even that decision to the Union

Review Committee.  Accordingly, the Court finds that the Union did not act arbitrarily in the handling of Plaintiff's grievance.

21.   The Court also finds that the Union did not act discriminatorily in handling Plaintiff's grievance either.  Plaintiff did not present any evidence whatsoever at trial to show that the Union discriminated against Plaintiff in the handling of his grievance, much less to show discrimination "that is intentional, severe, and unrelated to legitimate union objectives."  Rather, the credible testimony of Union representatives and employees made clear that the decision not to arbitrate Plaintiff's case was made in accordance with the Union's objectives to represent all of its members' best interests in the handling of each member's grievance.

22.   Finally, the Court also finds that the Union did not act in bad faith in handling Plaintiff's grievance either.  Plaintiff did not present any evidence that the Union had hostility toward Plaintiff nor that any such hostility negatively affected the Union's representation of Plaintiff.  Indeed, there is no evidence in the record of the Union's fraud, deceitful action, or dishonest action in its handling of Plaintiff's grievance.  To the contrary, the credible testimony of Union representatives and employees made clear at trial that the Union's representation of Plaintiff's grievance was zealous, despite its reservations about the validity of Plaintiff's claims.  Once it was clear after both hearings were held that Plaintiff did

not have any evidence to offer to show that he should be Medically Disqualified, the Union made the sound decision not to proceed on Plaintiff's behalf to binding arbitration because such an effort would be futile and costly to the Union and its members.

23.   Accordingly, judgment is properly entered in favor of Defendants and against Plaintiff as to Count V of the Complaint.

24.   An Order will follow.

DATED:  **July 1, 2020**                         BY THE COURT:

                                          **/s/ Chad F. Kenney**

                                          CHAD F. KENNEY, J.